UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOEL JAVIER, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 24-cv-12663-ADB |
| JOANN LYNDS, | * | |
| | * | |
| Respondent. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Petitioner Joel Javier ("Javier") is currently serving a life sentence without the possibility

of parole following his conviction for first-degree murder in violation of Massachusetts General

Laws ch. 265, § 1.  Javier was convicted for his role in the shooting death of Robert Gonzalez on

January 10, 2009, in Lawrence, Massachusetts.  Presently pending before this Court is Javier's

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, [ECF No. 2].  For the following

reasons, the petition is **DENIED**.

I.      **BACKGROUND**

        A.      **Facts**

        The Massachusetts Supreme Judicial Court ("SJC") provided the following account of

the facts, see Commonwealth v. Javier, 114 N.E.3d 945, 948–53 (Mass. 2019), which the Court

presumes to be correct, see Jewett v. Brady, 634 F.3d 67, 70 (1st Cir. 2011).

a. Background. The Commonwealth's theory at trial was that the defendant and his friends planned and carried out the shooting in retaliation for a fight in which the victim punched out the defendant's tooth.  The dispute between the victim and the defendant that led to the fight arose over an unpaid debt that the victim owed Cauris Gonzalez, the defendant's then girl friend, for a Honda Civic hatchback automobile that he had purchased from her in the summer of 2008.  By January of 2009, he had paid most of the cost of the vehicle, but still owed Cauris one hundred dollars.  Although the victim had not paid the full purchase price for the Honda Civic, by January 2009, he had sold it and had used the proceeds to purchase a Dodge Caravan minivan.

b. Evening before and day of the shooting. At approximately 6 P.M. on January 9, 2009, Cauris telephoned the victim and asked him to pay her the remaining one hundred dollars for the Honda Civic she had sold him.  The victim said that he did not have the money.  Using his own cellular telephone, the defendant then called the victim and got into an argument with him when the defendant asked him to pay Cauris and the victim said that he was not going to give the defendant any money.

Sometime between 7 or 8 P.M. that evening, the defendant and Cauris went to a party that was being hosted by several of the defendant's friends at their house on Essex Street.  At around 11 P.M., the defendant, Cauris, and the defendant's friend Yoshio Stackerman left to get some food at a nearby fast food restaurant.  They were expected to return to the party but did not; there was no evidence to establish where they went after leaving the house on Essex Street, until approximately 2 A.M. on January 10, 2009.

At that point, the defendant and Cauris were waiting in the drive-through lane at the same fast food restaurant.  Cauris was driving her mother's Dodge Caravan minivan, and the defendant was standing next to the vehicle.  Stackerman was not with them.  The victim and three friends drove past the restaurant, in the victim's Dodge Caravan.  When the victim saw the defendant and Cauris, he began yelling through the window of his vehicle, and the defendant began yelling back about the money the victim owed Cauris.  Immediately before the victim and his friends reached the restaurant, the victim, who seemed very angry, had been yelling at someone on his cellular telephone.  Call logs from the victim's and the defendant's cellular telephones showed three calls between those two numbers at approximately the same time, one at 2:12 A.M. and two at approximately 2:17 A.M.

The victim and his friends got out of his Dodge Caravan; the friends stood near the vehicle, about twenty to thirty feet away, and the victim headed toward the defendant.  The defendant then pulled out a knife and "waved it around," but did not lunge toward anyone.  Both men were yelling and "screaming." . . . The

2

victim, who was much larger and taller than the defendant, responded, "I don't want to hit you," then punched the defendant in the mouth, knocking out one of his teeth.  The defendant spit out his tooth and began spitting blood toward the victim.  One of the victim's friends picked up the tooth and "started showing it like it was funny."

The victim began to walk back toward his minivan, and the defendant followed, "screaming."  The defendant then threw his cellular telephone at the victim.  The telephone missed the victim, and broke when it hit the ground.  The defendant was still yelling at the victim when Cauris drove up in her mother's minivan and told the defendant to get in.  As the defendant was stepping into the minivan, he said to the victim, "Fuck you. It's not going to stay like this."  The defendant and Cauris drove off, leaving the broken cellular telephone on the ground.  Each returned to their parents' houses, from where they spent the night talking to each other on the telephone.

At around noon that day, the defendant and Cauris went to a pharmacy to get medication for the defendant's mouth, which was swollen but no longer bleeding; Cauris was driving her mother's minivan.  In the early afternoon of January 10, 2009, the victim and three of his friends drove to the defendant's parents' house.  The defendant and Cauris returned from their trip to the pharmacy at approximately the same time.  Cauris got out of her minivan and walked up to the front door while the defendant drove away.  When the defendant's mother answered, she saw a man she did not know -- the victim -- standing across the street, near a minivan.  He told her that he had the defendant's tooth and would sell it to her for "a thousand bucks."  He then entered his minivan and drove away; the defendant, who had been watching from a distance, returned to the house.  Sometime between 3:30 and 4 P.M., the defendant and Cauris drove his mother to work in Cauris's mother's minivan.

The Commonwealth relied extensively on telephone records and [cell site location information ("CSLI")] as circumstantial evidence of the location of the defendant, Cauris, and the defendant's friends in the hours before the shooting, and to show that all five had participated in planning the shooting, then stopped calling each other during the fifteen minutes immediately prior to the shooting, which occurred shortly before 6 P.M.

Call records and testimony were also introduced concerning calls on the day of the shooting between Cauris and her brother's then girl friend, Ashley Calisto, who had had surgery approximately one week earlier.  Telephone records showed that Cauris's telephone number called Calisto's telephone number at 1:40 P.M.; Cauris told police she had called to ask if she and the defendant could come by to visit Calisto that evening.  Telephone records also indicated that Cauris's telephone called Calisto's telephone number again at approximately 5:45 P.M. Calisto testified to receiving a call from Cauris at around that time.

Eight calls were made during the afternoon between the telephone numbers being used by the defendant and Cauris, Stackerman, Castro, and Wyatt; these telephone numbers also made calls to other numbers. No calls were made from any of the four numbers between about 5:45 P.M. and 6:01 P.M. Minutes after the shooting, at 6:01 P.M., Cauris's telephone called Castro's telephone number twice. Also at 6:01 P.M., Castro called for a taxicab and asked to be picked up at a location approximately two blocks from the scene of the shooting, while Cauris's telephone called Calisto's telephone three times shortly after the shooting, between 6:02 and 6:06 P.M.

Calisto testified that the defendant and Cauris arrived at her house at "6:15/6:10/6:20-ish." Calisto had just had surgery and Cauris had spoken with Calisto earlier that day to plan a visit. After about twenty minutes, Cauris left to pick up her mother at work, while the defendant stayed with Calisto. Cauris returned to Calisto's house at around 8 P.M.; Cauris and the defendant left together at around 9 P.M. The Commonwealth argued that the calls to Calisto indicated that Cauris and the defendant had planned their visit specifically to create an alibi for the time of the shooting.

c. The shooting. The shooting and the events immediately preceding it were video recorded by four surveillance cameras mounted on a private house in Lawrence. Two of the cameras produced images that were dark but had relatively clear footage; two other cameras, which faced the area where the victim's vehicle was parked, produced images of very poor quality. A composite from the four cameras, enhanced as far as possible, was created and played for the jury, then introduced as an exhibit.

The surveillance footage shows the victim's Dodge Caravan minivan driving north on Hampton Street at approximately 5:57 P.M. and parking on that street near an intersection, on the side of the street opposite the house. It is not possible to determine from the surveillance footage who was driving; the position of the victim when he was found, and testimony at trial, established that the victim had been the driver. There were two passengers, also not visible in the video footage, one in the front passenger's seat and one in the rear seat. After the minivan stopped, an individual got out on the passenger side and entered one of the buildings.

Another minivan came into view approximately twenty seconds later, driving along Haverhill Street. It stopped and four people got out. They walked across the street toward the victim's Dodge Caravan as the other vehicle drove away. The vehicle turned right onto a side street, turned around, and returned to Haverhill Street, driving out of view of the cameras in the same direction that it had been heading.

Two of the individuals who had crossed the street toward the victim's minivan walked behind and to the right of his vehicle, and two went to the left. The video

footage shows the victim's vehicle lurch forward and slide so that it was positioned diagonally across the road, while a pedestrian ducked. The four individuals ran from the scene, heading away from Haverhill Street and out of sight of the surveillance cameras. A person got out of the rear passenger's side of the victim's minivan and entered the front seat.

The passenger called 911 at 5:59 P.M. and attempted to help the victim until emergency aid arrived. Another call was made at close to the same time by a different individual. The first officer on the scene arrived within minutes, because he had been only a few blocks away when the call went out. The victim was conscious when the officer arrived, and he responded to the officer's question about what had happened by saying that he knew "who it was." He then lost consciousness. He was transported to a local hospital and was pronounced dead. An autopsy showed that the victim has been shot twice in the back, and that one of the bullets had lodged in his spinal column and another had pierced his heart. Either bullet would have been fatal within a short time.

d. <u>Investigation</u>. Numerous spent cartridge casings were found near the victim's vehicle. A ballistician examined them and determined that they had been shot from two different guns. There were six .45 caliber cartridge casings, near the rear of the victim's minivan, on the passenger's side; all had been fired from one semiautomatic weapon. There also were six .357 caliber cartridge casings, all of which had been fired from a single weapon, near the rear of the victim's minivan on the driver's side.

A few days after the shooting, when Lawrence police officers learned that the defendant had been involved in some kind of dispute with the victim, investigators went to the defendant's parents' house intending to interview him. His father contacted the defendant by cellular telephone, and the defendant and Cauris came to the house within minutes of the call. As he walked into the house, the defendant asked the officers whether they were there because of "the fight." The defendant and Cauris both agreed to go to the police station to speak with investigators. The defendant went with his father and was interviewed by Lieutenant Norman Zuk and Detective Carlos Cuevas.

The defendant waived his Miranda rights and agreed to the interview being recorded. With the defendant's assent, officers also photographed the defendant's mouth and the area of the missing tooth. The photograph and a video recording of the interview were introduced at trial. The defendant described the incident at the fast food restaurant. He told the officers that during an argument over the money the victim owed Cauris, his tooth had been knocked out with a pipe. He said that the victim and his friends had taken his cellular telephone and that, in response, he had thrown a knife at the victim but had missed. He did not mention throwing his cellular telephone. The defendant also told the officers that the victim had offered to sell his tooth to his mother, but he denied that he would have killed the victim over it. The defendant insisted repeatedly that he did not care about the tooth

being knocked out, because he "was going to buy another tooth anyways."

The defendant denied killing the victim but said that he understood when the officers asked whether he knew why the fight would make him appear to be a primary suspect.  He said that he had been staying at Cauris's house on his mother's suggestion, because there had been people at his house looking for him; he had heard that some people believed he had had something to do with the shooting because of the fight.  When asked where he was between 5 and 8 P.M. on January 10, 2009, the defendant said that he had been at Calisto's house from 5 P.M. onwards.  The defendant reiterated a number of times that he had been at Calisto's parents' house with Cauris at the time of the shooting, as the officers reposed the question and suggested that perhaps he had arrived later.  He was sure that he had arrived no later than 5 P.M., and that it could not have been around 6 P.M.

The officers also asked several questions about who the defendant's friends were and who he would "hang out" with.  The defendant mentioned the names "P Rock" (Pedro), "T" ("Torture"), "D Money" (Danny), and Georgie, as well as a "Puerto Rican cli[que]" whose names he did not know but who tended to socialize in a particular alley that he sometimes visited.  The defendant did not mention Stackerman, Wyatt, or Castro, and initially denied knowing the name of the victim.  He said that he knew the name of a friend of the victim, "Diddy."  The defendant claimed at first not to recognize a telephone number that appeared in call records as having called his cellular telephone, and that was listed in T-Mobile records as registered under his name.  He then indicated that he remembered having acquired an additional telephone for Cauris's brother, Ricard.  Later investigation determined that the cellular telephone was being used by Stackerman.

On February 19, 2009, State police Trooper Joshua Ulrich recreated the path of the unknown vehicle seen in the home surveillance footage, by driving Cauris's mother's minivan, which had been seized from her mother's workplace.  He attempted to replicate the lighting conditions of January 10, 2009, and drove according to the directions of another officer so that he could "copy the pattern that the suspect vehicle had executed."  The footage of this "reenactment" was then combined with another video recording.  Images of Cauris's mother's minivan were overlaid on images from the unknown vehicle in the surveillance footage, so that two vehicles could be compared to each other.

At the end of January 2009, the defendant's mother bought airplane tickets for the defendant and Cauris to travel to the Dominican Republic, so that he could have the missing tooth replaced with an implant.  The defendant told police during his interview that he had contacted his dentist in the United States and the dentist had told him an implant would cost approximately $3,000 because the defendant did not have insurance; in the Dominican Republic, the cost was approximately one hundred dollars.  The defendant remained in the Dominican Republic until

September 2009, working on his family's farm, and then returned to
Massachusetts.

In June 2011, the defendant was indicted on a charge of murder in the first degree.
When the defendant learned that a warrant for his arrest had issued, he went to the
Provincetown police headquarters on July 6, 2011, and turned himself in.

Javier, 114 N.E.3d at 948–53 (footnotes omitted).

### B.       Procedural History

On June 29, 2011, an Essex County Grand Jury indicted Javier for the murder of Robert

Gonzalez in violation of Massachusetts General Laws ch. 265, § 1, [ECF No. 13-1 at 86–87], to

which Javier pled not guilty, [id. at 8].  In June 2013, Javier's first jury trial began, but ended

with a deadlocked jury.  [Id. at 11].  In August 2013, Javier's second jury trial began.  [Id. at 12].

At the close of the Commonwealth's case, and again at the close of all evidence, Javier filed

motions for a directed verdict of not guilty.  [Id. at 168–69].  Those motions were denied.  [Id. at

13].  On September 9, 2013, the jury returned a guilty verdict of murder in the first degree.  [Id.].

The trial court sentenced Javier to life imprisonment without the possibility of parole.  [Id.].

On September 17, 2013, Javier timely filed a notice of appeal.  [ECF No. 13-1 at 13].  On

January 28, 2019, the SJC affirmed Javier's conviction.  [Id. at 19]; see Javier, 114 N.E.3d at

955, 962.  Javier filed a petition for rehearing on February 19, 2019, but the motion was denied

on May 8, 2019.  [ECF No. 13-1 at 19].  On July 14, 2020, Javier filed a preliminary motion for

a new trial, [id. at 14], in which he argued that his trial counsel was ineffective for failing to

retain a CSLI expert, [id. at 271].  In support of this motion, Javier filed a report, [ECF No. 20 at

35–149], and an affidavit, [id. at 150–57], from a CSLI expert, as well as an affidavit from his

trial counsel, [id. at 168–71].  The motion was denied on April 9, 2024.  [ECF No. 20 at 172–88].

Javier filed a notice of appeal on May 8, 2024, [ECF No. 13-1 at 16], and, on June 7, 2024, filed

an application with the SJC seeking leave to appeal the trial court's denial of his motion for a

7

new trial. [ECF No. 13-1 at 269–93]. On October 17, 2024, a single justice of the SJC, functioning as a "gatekeeper" pursuant to Massachusetts General Laws ch. 278, § 33E, denied the application because Javier "failed to raise any issues which are both 'new' and 'substantial' within the meaning of § 33E." [ECF No. 20 at 189–98].

On October 22, 2024, Javier filed this petition. [ECF No. 2]. On December 4, 2024, Respondent Joann Lynds ("Lynds") filed an answer to the petition. [ECF No. 13]. On February 24, 2025, Javier filed a memorandum of law in support of his petition. [ECF No. 20]. On April 29, 2025, Lynds filed a memorandum of law in opposition to Javier's petition. [ECF No. 21].

## II.    LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has previously been adjudicated on the merits by a state court, a petitioner may only obtain habeas relief if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Brown v. Davenport, 596 U.S. 118, 127 (2022).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established Supreme Court precedent[1] if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law;" or (2) the state court decides a case differently from a

---

[1] Only Supreme Court decisions constitute clearly established federal law for habeas purposes. See Brown, 596 U.S. at 136; Parker v. Matthews, 567 U.S. 37, 48–49 (2012) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' It therefore cannot form the basis for habeas relief under AEDPA." (citation omitted)).

decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., delivering the opinion of the Court). A state court unreasonably applies federal law when it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018). Section 2254(d)(1) does not, however, "require state courts to extend [Supreme Court] precedent or license federal courts to treat the failure to do so as error." Id. (quoting White v. Woodall, 572 U.S. 415, 426–27 (2014)). The unreasonable-application clause "affords relief 'if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.'" Webster v. Gray, 39 F.4th 27, 34 (1st Cir. 2022) (quoting White, 572 U.S. at 427). In other words, to warrant relief, "the state court's application of Supreme Court precedent 'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" Id. (quoting White, 572 U.S. at 419); Field v. Hallett, 37 F.4th 8, 16 (1st Cir. 2022) ("Even where a state court has misapplied federal law, we will only grant relief to the petitioner 'in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents.'" (quoting Strickland v. Goguen, 3 F.4th 45, 53 (1st Cir. 2021))). "'[T]he more general the [federal] rule[,] . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations' before their decisions can be fairly labeled unreasonable." Brown, 596 U.S. at 144 (alterations in original) (quoting Renico v. Lett, 559 U.S. 766, 776 (2010)).

Section 2254(d)(2), an alternative to § 2254(d)(1), requires Petitioner to show that the state court's decision on the merits "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." An "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2) is a "demanding showing." Porter v. Coyne-Fague,

9

35 F.4th 68, 75 (1st Cir. 2022).  The Court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the Court] would have reached a different conclusion in the first instance.'"  Brumfield v. Cain, 576 U.S. 305, 313–14 (2015) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).  Section 2254(d)(2) "requires that [the Court] accord the state trial court substantial deference."  Id. at 314.  "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"  Wood, 558 U.S. at 301 (quoting Rice v. Collins, 546 U.S. 333, 341–42 (2006)).

Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 562 U.S. 86, 103 (2011).  "The petitioner carries the burden of proof."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citing Woodford v. Visciotti, 537 U.S. 19, 25 (2002)).  "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington, 562 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).  "'[T]he gap between erroneous state court decisions and unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap.'"  O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quoting Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008)).

Further, a federal court also cannot grant habeas relief to a state prisoner unless the petitioner has first exhausted his federal constitutional claims in state court.  See 28 U.S.C. § 2254(b)(1)(A).  The petitioner "must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  O'Sullivan v. Boerckel,

526 U.S. 838, 842 (1999).  A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court.  Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014) (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)).  "[A] petitioner, [in other words,] must have 'tendered his federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'"  Id. (quoting Casella, 207 F.3d at 20).  That said, if "a habeas petitioner's unexhausted claim is patently without merit, the AEDPA allows a federal court, in the interests of judicial economy, to dispose of that claim once and for all."  Coningford v. Rhode Island, 640 F.3d 478, 483 (1st Cir. 2011) (citing 28 U.S.C. § 2254(b)(2); Granberry v. Greer, 481 U.S. 129, 135 (1987)).

III.      DISCUSSION

Javier raised two constitutional claims in state court: (1) that his due-process rights were violated because he was convicted on insufficient evidence, and (2) that he did not receive effective assistance of counsel because his trial counsel did not retain an expert to analyze the prosecution's CSLI data.  He now argues that he is entitled to federal habeas relief because the SJC's denial of his insufficient-evidence claim was based on an unreasonable determination of the facts, and the gatekeeper's denial of his ineffective-assistance-of-counsel claim was contrary to clearly established federal law.  [ECF No. 20 at 13–33].

A.      Ground One: Legal Insufficiency

There is no dispute that the SJC applied the correct legal standard in deciding Javier's insufficient-evidence claim.[2]  Consistent with that standard, the SJC concluded that, "with

---

[2] The federal standard for sufficiency-of-the-evidence challenges requires reviewing courts to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

specific reference to the elements of the offense as defined by state law," Ortiz v. Dubois, 19

F.3d 708, 717 (1st Cir. 1994) (quoting Campbell v. Fair, 838 F.2d 1, 4 (1st Cir. 1988)), the

evidence at trial "would have permitted a rational juror to find, beyond a reasonable doubt, that

[Javier] participated in the shooting and that he had the requisite mental state to sustain a

conviction of murder in the first degree on a theory of deliberate premeditation." Javier, 114

N.E.3d at 955.[3]   Under AEDPA's deferential standard of review, the Court may grant Javier's

petition on insufficient-evidence grounds only if the SJC's decision was "objectively

unreasonable." Gomes v. Silva, 958 F.3d 12, 21 (1st Cir. 2020) (quoting Parker v. Matthews,

567 U.S. 37, 43 (2012)).  Javier argues that it was, because the evidence against him was in "the

realm of speculation." [ECF No. 20 at 13–14].  The Court is not persuaded.

Javier's primary argument is that because the SJC determined there was insufficient

evidence to convict his codefendant Cauris Gonzalez, see Commonwealth v. Gonzalez, 56

N.E.3d 1271, 1288–89 (Mass. 2016), who was "tried . . . on the same actual evidence," the

evidence in his case, too, falls "below the line set by sufficient circumstantial evidence."  [ECF

No. 20 at 14].  Repeatedly analogizing to Gonzalez, he contends that the Commonwealth's

---

reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  In rejecting Javier's
challenge, the SJC applied Massachusetts's Latimore standard, see Javier, 114 N.E.3d at 955,
which is "functionally identical" to the federal Jackson standard, Logan v. Gelb, 790 F.3d 65, 71
(1st Cir. 2015); see also Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008) ("[T]he Latimore
court adopted the governing federal constitutional standard as the Massachusetts standard for
sufficiency of the evidence challenges." (citing Commonwealth v. Latimore, 393 N.E.2d 370,
374 (Mass. 1979))).
[3] To show first-degree murder with deliberate premeditation, the Commonwealth was required to
prove "that the defendant intentionally caused the death of the victim 'after a period of
reflection.'"  Javier, 114 N.E.3d at 954 (quoting Mass. Model Jury Instructions on Homicide 46
(2018)).  To show that Javier was a joint venturer, the Commonwealth had to "prove beyond a
reasonable doubt that the 'defendant knowingly participated in the commission of the
crime . . . with the intent required to commit the crime.'"  Id. at 954–55 (quoting Mass. Model
Jury Instructions on Homicide 13 (2018)).

evidence was insufficient to establish the following facts: (1) that the suspect vehicle was the Dodge Caravan belonging to Cauris's mother; (2) that the CSLI evidence demonstrated that Cauris's cell phone (and thus Javier) was at the crime scene; and (3) that Javier knew of and shared the co-occupants' intent to kill.  [Id. at 13–22].

The underlying premise of this argument is mistaken, because sufficiency challenges turn on courts' consideration of the record with respect to the individual defendant, not on a comparison between outcomes for different codefendants.  See Housen v. Gelb, 744 F.3d 221, 226–27 (1st Cir. 2014) ("The sufficiency of the evidence in any given case must be tested against the record in that case.").  Accordingly, the outcome of one defendant's case has no bearing on a codefendant's insufficient-evidence claim, even when the underlying records are the same.  See United States v. Angulo-Hernández, 565 F.3d 2, 7 (1st Cir. 2009) (rejecting defendants' sufficiency challenges despite acquittal of codefendants on evidence "exactly the same as to all of the . . . defendants").

In any event, the evidence against Javier is distinguishable from the evidence against Cauris in important ways, as the SJC discussed at length.  For example, unlike in Cauris's case, Javier's case involved compelling evidence pertaining to his state of mind around the time of the crime.  As the SJC noted, Javier had "motive to kill the victim," based on the victim knocking out Javier's tooth in front of others, taunting him, and trying to sell the tooth to his mother. Javier, 114 N.E.3d at 956.  There was also "significant evidence that [Javier] was angered by the victim's actions, and intended to act on that motive," including that Javier yelled slurs and threats at the victim, waved a knife, and followed the victim back to his vehicle, as well as the false statements Javier made in his police interview three days after the killing.  Id.  Additionally, the consciousness-of-guilt evidence specific to Javier was "much stronger than at Cauris's trial."

Id. at 957.  This evidence included Javier's multiple claims that he arrived at Calisto's house earlier than the time that Calisto's testimony at trial specified; the fact that, in response to police questioning, he gave names of people that his friends did not know, and that he did not give the names of codefendants Castro, Wyatt, or Stackerman; his denial that he knew the victim's name; and his eight-month stay in the Dominican Republic, where he and Cauris went a few weeks after the killing, compared to Cauris's one-month stay.  Id. at 957–58.

As explained above, the Court's inquiry is limited to whether the SJC's decision was objectively unreasonable.  Here, the SJC's decision was based on the "network of facts" in its totality, Javier, 114 N.E.3d at 955, including the CSLI and cell-phone evidence common to both Javier and Gonzalez, as well as the above-referenced evidence relevant only to Javier.  And while Javier disputes the extent to which some of this evidence supported the Commonwealth's case, e.g., [ECF No. 20 at 15 n.8 (arguing that "[t]he idea that Mr. Javier's trip to the Dominican Republic demonstrated consciousness of guilt was far from compelling")], the Court "may not freely reweigh competing inferences," Gomes, 958 F.3d at 22 (quoting Magraw v. Roden, 743 F.3d 1, 7 (1st Cir. 2014)).  In sum, the SJC's decision was not objectively unreasonable in light of the evidence at trial.

### B.        Ground Two: Ineffective Assistance of Counsel

Javier also seeks habeas relief on the basis that his trial counsel was ineffective because he failed to retain a CSLI expert, where the "evidence that trial counsel could have presented . . . had he consulted with an expert . . . would have been a real factor in the jury's deliberations." [ECF No. 20 at 22–32].  Although the gatekeeper's determination that his ineffective-assistance claim failed to raise new arguments would typically be a procedural default barring habeas review, Javier asserts that he has raised new challenges and that his claim is therefore not

14

defaulted.  In light of the standard of review applicable to state procedural defaults, the Court is not persuaded.

When a state-court decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment," Coleman v. Thompson, 501 U.S. 722, 729 (1991) (citing Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935)), regardless of whether the ground is "substantive or procedural," id. (citing Fox Film Corp., 296 U.S. at 210), federal habeas review is precluded, Simpson v. Matesanz, 175 F.3d 200, 207 (1st Cir. 1999), unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that "failure to consider the claims will result in a fundamental miscarriage of justice," Coleman, 501 U.S. at 750.

Here, the gatekeeper's decision establishes a procedural default that prevents this Court from reviewing the underlying claim.  See Simpson, 175 F.3d at 207.  Under the Massachusetts statute governing postconviction appeals in first-degree murder cases, Mass. Gen. Laws ch. 278, § 33E, a defendant is required to "present all his claims of error at the earliest possible time," and "failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal." Commonwealth v. Rogers, 241 N.E.3d 647, 658 (Mass. 2024) (quoting Commonwealth v. Billingslea, 143 N.E.3d 425, 443 (Mass. 2020)).  After a direct appeal to the SJC, defendants may file a motion for a new trial in state superior court.  Lee v. Corsini, 777 F.3d 46, 55 (1st Cir. 2015).  "[N]o appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court." Mass. Gen. Laws ch. 278, § 33E.  Where, as here, the single justice denies the gatekeeper petition based on a determination that the claim raised is neither new nor substantial,

15

[ECF No. 20 at 196–98], such a denial represents a state-court finding that the petitioner failed to raise his claim of error at the earliest opportunity, and "is the classic example of an independent and adequate state ground." Simpson, 175 F.3d at 207 (first citing Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995); then citing Wainwright v. Sykes, 433 U.S. 72, 86–88 (1977); and then citing Ortiz v. Dubois, 19 F.3d 708, 714 (1st Cir. 1994)).[4]  Because the gatekeeper found Javier's claim to be procedurally defaulted under Massachusetts General Laws ch. 278, § 33E, federal habeas review is barred unless he can demonstrate cause and prejudice or satisfy the fundamental-miscarriage-of-justice test.

Javier argues that the gatekeeper's denial of his claim, "in the peculiarly unique circumstances presented," does not establish a procedural default because the gatekeeper's determination that his claim was not new was "extraordinarily incorrect" and contradicted "well-settled" Massachusetts law.  [ECF No. 20 at 22–24].  Though it is true that "[i]n exceptional cases," a state-law ground may not be "adequate to preclude review of a federal question" if the "state-court judgment rests on a novel and unforeseeable state-court procedural decision lacking fair or substantial support in prior state law," Cruz v. Arizona, 598 U.S. 17, 32 (2023), the Supreme Court almost always treats state procedural defaults as adequate to preclude federal judicial review, deviating only where the state court's application of a procedural rule "abruptly departed from and directly conflicted with its prior interpretations of that Rule," id.; see, e.g., Ford v. Georgia, 498 U.S. 411, 425 (1991) (holding Georgia Supreme Court procedural ruling inadequate because it applied a precedent inapplicable "even by its own terms"); Bouie v. City of

---

[4] "[A] finding that the issue is new but not substantial," by contrast, "does not [amount to procedural default." Lee, 777 F.3d at 56.  For that reason, the Court focuses here on the gatekeeper's conclusion that the issue raised was not new.

16

Columbia, 378 U.S. 347, 355–56 (1964) (holding South Carolina Supreme Court procedural ruling inadequate because it had "not the slightest support in prior South Carolina decisions"); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 456–57 (1958) (holding Alabama Supreme Court procedural ruling inadequate because it conflicted with the court's "past unambiguous holdings"). State courts' interpretations of their own procedural rules are entitled to careful respect, as they serve an "important interest in finality," and "significant harm to the States . . . results from the failure of federal courts to respect them." Coleman, 501 U.S. at 750. The principles of "comity and federalism" that underlie the independent-and-adequate-grounds doctrine, Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (quoting Coleman, 501 U.S. at 730), ordinarily prohibit the Court from "second guess[ing] a state court's rejection of a claim on the basis of an independent and adequate state procedural rule," Logan, 790 F.3d at 70 (citing Coleman, 501 U.S. at 750).

Here, the gatekeeper's determination that Javier did not raise a new argument does not "lack[] fair or substantial support in prior state law," Cruz, 598 U.S. at 32, and it is thus an adequate state-law procedural ground that prevents the Court from considering Javier's substantive federal claim. Under Massachusetts law, "[a]n issue is not 'new' . . . where either it has already been addressed, or . . . it could have been addressed had the defendant properly raised it." Commonwealth v. DiBenedetto, 203 N.E.3d 579, 588 (Mass. 2023); accord Lee, 777 F.3d 46. An ineffective-assistance claim, even if presented for the first time, may not be new if the core issue underlying the claim was considered and resolved on direct appeal. See Commonwealth v. Gunter, 945 N.E.2d 386, 390–95 (Mass. 2011). Here, Javier's ineffective-assistance claim was based on his trial counsel's decision "not to consult with a CSLI expert." [ECF No. 20 at 25]. Though it is true that Javier only raised the ineffective-assistance claim

17

after direct appeal, the gatekeeper did not contradict prior precedent in concluding that the ineffective-assistance claim was based on a premise that had been raised before. On direct appeal, the full SJC considered whether Javier was prejudiced by certain CSLI evidence and held that the disputed evidence "would not have had any impact on the jury's verdict." Javier, 114 N.E.3d at 960. On that basis, the gatekeeper concluded that Javier "has repackaged the [CSLI] argument under the label of ineffective assistance of counsel," rendering his claim not new. [ECF No. 20 at 196]. That conclusion was not without support in prior state law. See Gunter, 945 N.E.2d 386, 390–95 (Mass. 2011).

Finally, Javier has not "demonstrate[d] cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider [his] claim[] will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Accordingly, "federal habeas review of the claim[] is barred." Id.

## IV. CONCLUSION

For the above reasons, Javier's petition for writ of habeas corpus, [ECF No. 2], is **DENIED**. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner. Rules Governing Section 2254 Cases, R. 11(a). Given that Petitioner has not "made a substantial showing of the denial of a constitutional right," the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED**.

June 3, 2026                                    /s/ Allison D. Burroughs
                                               ALLISON D. BURROUGHS
                                               U.S. DISTRICT JUDGE

18